Volume 1

Pages 1 - 77

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

United States of America,       )
                                )
            Plaintiff,          )
                                )
  vs.                           )  NO. CR 05-0167-WHA
                                )
Raymon Milburn, Edgar Diaz, and )
Emile Fort,                     )
                                )  San Francisco, California
            Defendants.         )  Monday
                                )  August 18, 2008
_____)  8:57 a.m.

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Plaintiff**:              Joseph P. Russoniello
                                United States Attorney
                                450 Golden Gate Avenue, Box 36055
                                San Francisco, CA  94102
                                (415) 436-7232
                                (415) 436-7234 (fax)
                        BY:  **DAVID HALL**
                             **WILLIAM FRENTZEN**


**For Defendant**               Law Offices of Michael Burt
**Edgar Diaz:**                 600 Townsend Street, Suite 329E
                                San Francisco, California 94103
                                (415) 522-0840
                                (415) 522-1506 (fax)
                        BY:  **MICHAEL N. BURT**


(Appearances continued on next page)

**Reported By:**   **Lydia Zinn, CSR #9223, RPR**
                   **Official Reporter - U.S. District Court**

```
 1   APPEARANCES (CONT'D)
     For Defendant          Tony Tamburello
 2   Edgar Diaz:            214 Duboce Avenue
                            San Francisco, California  94103
 3                         (415) 431-4500
                      BY:  TONY TAMBURELLO
 4
     For Defendant          Law Offices of Lynne S. Coffin
 5   Raymon Milburn:       38 Miller Avenue, #328
                            Mill Valley, California  94941
 6                         (415) 388-2432
                           (415) 334-5441 (fax)
 7                    BY:  LYNNE S. COFFIN
 8   For Defendant          Law Offices of Michael Satris
     Emile Fort:           Post Office Box 337
 9                         230 Larch Road
                            Bolinas, California  94924
10                         (415) 868-9209
                           (415) 868-2658 (fax)
11                    BY:  MICHAEL SATRIS

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **THE CLERK:**  Criminal Number CR. 05-167, United States

2    versus Raymon Milburn, Edgar Diaz, and Emile Fort.

3          **MR. HALL:**  David Hall and Will Frentzen for the

4    United States, your Honor.  Good morning.

5          **THE COURT:**  Welcome back.

6          **MR. HALL:**  Thank you.

7          **THE COURT:**  All right.  How about on the defense

8    side?

9          **MR. TAMBURELLO:**  Tony Tamburello.

10          **MR. BURT:**  Michael Burt for Mr. Diaz.  Good morning.

11          **MR. TAMBURELLO:**  Mr. Diaz will be coming in shortly

12    your Honor.

13          **MS. COFFIN:**  Good morning, your Honor.  Lynne Coffin,

14    for Mr. Milburn.

15          **MR. SATRIS:**  Courtney Bell, our litigation

16    specialist, is with us today.

17          **MS. BELL:**  Courtney Bell.  I'm a litigation

18    specialist.

19          **THE COURT:**  Okay.  Welcome to you.  Have a seat.

20          (Pause in proceedings.)

21          **THE COURT:**  All right.  May we start now?

22          **MR. BURT:**  Yes, your Honor.

23          **THE COURT:**  All defendants are present.  All counsel

24    are present.  We're here for a number of motions.  And I guess

25    my suggestion is that we start with the longer one, entitled,

1  "Motion to Preclude Punishment-Related questions or, in the

2  alternative, Motion in Support of Request for Appropriate

3  Punishment-Related *Voir Dire*, Attorney Questioning, Use of Jury

4  Questionnaire, and Individual Sequestered *Voir Dire* on Certain

5  Topics."  This is a motion by Mr. Burt and Mr. Tamburello.

6        Does everyone -- is this joined in by all defendants?

7        **MR. SATRIS:**  Yes, your Honor.

8        **THE COURT:**  All right.  So let's hear from whoever is

9  going to argue this.

10        **MR. BURT:**  Judge, I think the law on the various

11  aspects of this motion that deal with several issues -- that is

12  pretty well set out in the papers, so I don't really intend to

13  argue the law to the Court, unless the Court wants specific or

14  has specific questions.

15        In terms of the various things we're proposing on the

16  juror questionnaire, as we indicated in the papers, we

17  submitted a questionnaire to the Court which is a working

18  draft, and something that, I think, after we got the Court's

19  insights on -- your thoughts on the jury questionnaire -- that

20  the parties could get together and ferret out any differences

21  we might have, and then come up with a final proposal.

22        We also have a proposed introductory instruction that

23  we're asking the Court to give.

24        The Government objects to that, although I'm not sure

25  what the specific objections are, other than that they object

1  to it.

2  And we're asking the Court also for some ability for

3  counsel to question the jurors.

4  And we're asking for individual sequestered *voir dire*

5  on the punishment aspects of the case, and also the publicity

6  aspects of the case.

7  **THE COURT:**  Well, let's list.  Go through that again,

8  and let me make sure I've got the list.

9  I agree with you.  I don't think we need argument on

10  the legal issues; but the questionnaire and the timing of the

11  questionnaire, and the -- just counsel and supplemental

12  questioning by counsel.  Let's list all of those items, and

13  have a discussion on those, sir.  Go down that again.

14  **MR. BURT:**  Well, first of all, on the timing of the

15  questionnaire --

16  **THE COURT:**  All right.

17  **MR. BURT:**  -- that's something we'd like to talk

18  about:  the questionnaire and its contents; whether there

19  should be some attorney-conducted *voir dire*.

20  **THE COURT:**  Mm-hm.

21  **MR. BURT:**  Whether the questioning about the death

22  penalty, in particular, and any publicity questions should be

23  conducted individually, as opposed to in a group setting.

24  And then the other issue we raise is the content of

25  the questioning in terms of whether counsel would be permitted

1  to ask questions which relate to the facts of this case.  In

2  general, questions about some of the circumstances of

3  mitigation and aggravation, as opposed to simply asking

4  penalty-related questions in the abstract.  So that's

5  another --

6          **THE COURT:**  All right.

7          **MR. BURT:**  -- consideration.

8          And in terms of timing, one of the issues we wanted

9  to raise with the Court was what the Court's plan was in terms

10 of when you would be telling the jurors to fill out the

11 questionnaire, and when you would be telling them to come back

12 for the opening statements and the presentation of evidence.

13         One thought we had -- and I've discussed this with

14 Government counsel, and I think we're in agreement -- is that

15 the Court is going to run into problems if we try and schedule

16 evidence presentation and opening statements before the first

17 of the year, because if we start on November 17th, you're going

18 to run squarely into the holidays.  My experience in cases of

19 this length, around that holiday time period, you're going to

20 lose maybe 20, 30 percent of the people, who are going to say

21 they have holiday plans.

22         So one proposal would be that we begin the

23 jury-selection process from November 17th until the end of the

24 year, but that the Court arrange a schedule so that the actual

25 presentation of evidence takes place sometime after the first

1  of the year.  And then that time period between November 17th

2  to the end of the year would be taken up in the questioning of

3  the jurors, and putting ourselves in a position to actually

4  begin the evidence.

5          And I think that's realistic in terms of how long

6  it's going to take us to select the jury, given the number of

7  defendants that we have here.

8          **THE COURT:**  Okay.  Let me hear first from the

9  Government, just on the timing question and the general scope

10 of what the questionnaire should be.

11         I'm generally inclined to use a questionnaire, but

12 maybe not these specific questions; but let's not get into

13 specifics so much as the timing of the questionnaire, the

14 timing of the *voir dire*, and the timing of the presentation of

15 evidence.  Mr. Hall.

16         **MR. HALL:**  Your Honor, we do agree with Mr. Burt that

17 starting and picking the jury through November and perhaps into

18 December, and starting evidence in January, would be the right

19 way to go.

20         We think that there's enough problems getting a jury

21 that's death-qualified, and just the length of this case, let

22 alone the problems that would be inherent with, if not all,

23 most jurors, as far as wanting to schedule evidence during the

24 Thanksgiving/Christmas area.  So we think that timing is most

25 appropriate.

1      We also have an additional problem that is our
2  problem.  And I don't mean to burden the Court with it, but one
3  of the other reasons we think it's appropriate is Mr. Frentzen
4  is going to have a trial there in November/end of January or
5  into December, probably.  We would be prepared to go forward
6  without him, but it's certainly -- and perhaps he could pick up
7  as we went along, but it certainly would help the Government if
8  we started evidence after Mr. Frentzen was done with his other
9  trial.

10         **THE COURT:**  When is that going to be done?

11         **MR. FRENTZEN:**  Judge, I have a case with
12  Judge Chesney that's been set for November 12.  It's
13  anticipated to last about two months.

14         **THE COURT:**  Well, then how are you dealing with the
15  Christmas holiday problem in that case?

16         **MR. FRENTZEN:**  We're going during Christmas.

17         **THE COURT:**  You're what?

18         **MR. FRENTZEN:**  We're going to have trial during
19  Thanksgiving and Christmas, apparently.

20         **THE COURT:**  Are you going to lose jurors in that
21  case?

22         **MR. FRENTZEN:**  I hope not.

23         **THE COURT:**  Is this another one of these alleged RICO
24  gang cases?

25         **MR. FRENTZEN:**  It's down to one defendant, but it's a

1   capital defendant, but it is.  We're hopeful that it's going

2   to -- that we're not going to have too many problems, but

3   that's one we're set for.

4   **THE COURT:**  Okay.  Well, let me give you an idea.

5   All right?  This is not a ruling.  This is for comment; that we

6   would send out a questionnaire, probably in about two weeks, to

7   the prospective jurors.

8   Now, in my -- I need your input.  Let's -- I'm going

9   to need your input on how many people get summoned.  This is

10  not your ordinary case.  Let's assume that we're trying

11  everyone together:  all three defendants.  So we need to tell

12  the prospective jurors how long that case will last.  And we

13  will be in session 7:30 in the morning to 1:00 each day,

14  including Fridays, unless, for some reason, we needed to take

15  that day off.

16  When the jury starts to deliberate, they can

17  deliberate longer than those hours.  And maybe for good cause,

18  one or two times we could go past 1:00.

19  Now, lawyers don't like 7:30 in the morning, but the

20  jurors love it.  And they love to get out of here at 1:00 and

21  go on with the rest of their lives, so that's what we're going

22  to do:  7:30 to 1:00.  Some lawyers like it, but the jury

23  convenience here means a lot.  And you lawyers are

24  professionals and will rise to the occasion.  And you will find

25  that this is an excellent system.  The jury pays very close

1   attention when it's 7:30 to 1:00.  And in the afternoons, they

2   drowse off.  So this is a good all the way around.

3       We don't have any lunch break.  We have a mid-morning

4   break, and then a second mid-morning break; sometimes even a

5   third break.  It depends, but this gets in almost as much time

6   as a regular 9:00 to 5:00 day.  It's about 45 minutes shorter,

7   but when you see the transcript booklets, they look the same.

8   And in my judgment from my days as a trial lawyer, you get as

9   much done in the 7:30 to 1:00 as you do from 9:00 to 5:00.

10      Now, at 7:30 the lawyers are here.  We go over the

11  motions *in limine* for the day.  The jury gets here at 7:45.  We

12  always start no later than 8:00 with the jury.  Some days

13  they -- the lawyers -- don't have anything.  It's amazing how

14  good the jurors are.  Maybe even you were in this case.  We had

15  14 jurors over there.  No one had a motion *in limine*.  At 7:37

16  in the morning --

17      You think you were in that case, Mr. Hall?

18      **MR. HALL:**  I think I was.

19      **THE COURT:**  -- we had the witness on the stand,

20  taking evidence at 7:37 in the morning.  And the jurors are

21  bright and early.  They're ready to go.  They want to hear the

22  evidence.  And so this works great.

23      Now, with that schedule in mind, assuming that we

24  went five days a week, which may not be quite right, but mostly

25  right, how long do you think the Government's evidence would

1  last in this case?

2         **MR. HALL:**  Six to eight weeks, your Honor.

3         **THE COURT:**  That's a long time.

4         **MR. HALL:**  It is.  We have a lot of -- the Court is

5  aware of all the factual scenarios that we allege in our --

6         **THE COURT:**  Well, all right.  Six to eight.  I'm

7  writing this down, but not -- six to eight weeks -- not

8  necessarily approving of it, but I respect your estimate.  All

9  right.

10         **MR. FRENTZEN:**  Judge, I'm sorry.  I don't mean to

11  interrupt, but just to get -- as the Court's aware, I mean,

12  there are -- alone, there are six homicides in this case,

13  committed by two of these defendants.  And so, I mean, I'm just

14  trying to give a sense of -- I mean, having tried individual

15  murder cases, murder trials before, I mean --

16         **THE COURT:**  All right.  I would -- I'm not saying

17  it's unreasonable.  I'm just saying it's a long time.  That's

18  the Government's case, alone.

19         Roughly, what do you think it's going to be on the

20  defense side, for the defense witnesses?

21         **MR. BURT:**  I think the short answer is:  it's hard to

22  predict, because of the situation with the discovery and the

23  need to do investigation.  Once we see our Jencks Act and other

24  material that we're going to receive --

25         And is -- I'm assuming what we're talking about is

1  six to eight weeks for the guilt phase?

2  **THE COURT:**  Right.  I think that's what you meant.

3  **MR. HALL:**  Yes.

4  **THE COURT:**  The guilt, yeah.

5  **MR. BURT:**  I would say the defense portion of the

6  sentencing phase would probably going to be six to eight weeks

7  in itself.

8  And there's -- at least on behalf of Mr. Diaz, I

9  don't think there's any way we can predict what the guilt-phase

10  portion of the case would be for us at this point.

11  **THE COURT:**  Then what do you mean:  the six to eight

12  weeks?

13  **MR. BURT:**  Well, I think six to eight weeks for the

14  defense presentations of the penalty phase.  And that's

15  assuming --

16  **THE COURT:**  Well, that's penalty phase.

17  **MR. BURT:**  Yeah, in the penalty phase.  That would be

18  assuming you have three defendants facing the death penalty.

19  We still have one where we don't know what the decision is.

20  **THE COURT:**  All right.

21  **MR. BURT:**  So that's going to affect the schedule.

22  **THE COURT:**  Then on the guilt phase, what do you

23  think?

24  **MR. BURT:**  On behalf of Mr. Diaz, I would think our

25  portion of of whatever we're going to put on -- we can probably

1  do that in three weeks, at most.  That would be outside, I

2  suppose.

3         **THE COURT:**  Does that count everybody, or is this all

4  three defendants, or just you?  Just --

5         **MR. BURT:**  I was thinking just in terms of our own

6  presentation.  And that would be an outside estimate.

7         **THE COURT:**  How about the other defendants?

8  Mr. Satris.

9         **MR. SATRIS:**  I really can't say, your Honor.  I

10 wouldn't think it would be any longer than that, either -- than

11 three weeks.  And -- and that would be the outside for penalty

12 also.  The estimate that was given -- it wouldn't be any longer

13 than that.

14        **THE COURT:**  Okay.  Ms. Coffin, what do you say?

15        **MS. COFFIN:**  Well, assuming that we remain

16 non-capital, then I would say in the guilt phase, two weeks

17 would be the outside.

18        **THE COURT:**  All right.  Well, let's say 16 weeks,

19 guilt phase.

20        Now I'm not -- I'm asking you:  is that for the total

21 trial, all defendants, sixteen weeks, all evidence?  Does that

22 sound like it's at least 60:40, percent wise, that that will

23 prove out to be a good estimate?

24        **MR. HALL:**  Yes, your Honor.  And I think 16 weeks

25 is -- would be erring on the high side.  And I think that's

1  probably the way to go.  I don't see going longer than 16

2  weeks, guilt phase.

3        **MR. TAMBURELLO:**  Maybe my math is off here, but if

4  you take the low estimates of each party, it comes to 20 weeks.

5  Government is six to eight.  The Diaz defense is three.

6  Penalty --

7             Just for the guilt phase?

8        **THE COURT:**  Just for the guilt phase.  Just for the

9  guilt phase is what I meant.

10        **MR. TAMBURELLO:**  Okay.  Sorry.

11        **THE COURT:**  All right.  Let me ask you something.

12  For those of you who have done capital cases before, do you go

13  immediately after -- if there's a guilty verdict, you go

14  immediately into penalty, or do you have a week off?  What do

15  you do with the -- or is it --

16        **MR. FRENTZEN:**  I have gone immediately into it.  And

17  if there were to be any delay, it would be the Government's

18  preference it would be a very brief delay.

19        **THE COURT:**  How about on this side?

20        **MR. BURT:**  Yeah.  We don't have that much experience

21  in federal cases, but generally during some period of time

22  where there are motions to be taken up relating just to the

23  penalty phase, I know you had made some rulings where you

24  indicated that issues would be deferred until after a guilty

25  verdict came in, so there's usually at least some time

1  period -- about a week, approximately -- where those kinds of

2  issues are ironed out.  Sometimes there are

3  witness-availability problems, but I think in general, there's

4  some period of time between the two phases.

5         **THE COURT:**  What -- all right.  Everyone over there

6  want to add or subtract anyone?

7         **MR. SATRIS:**  I would only add, your Honor, I think,

8  at least a week to regroup and get ready.

9         **THE COURT:**  All right.  Ms. Coffin, anything on this?

10         **MS. COFFIN:**  I agree.

11         **THE COURT:**  All right.  Now we go to -- how long will

12  the penalty phase be for the Government?

13         **MR. HALL:**  Your Honor, we would expect that most of

14  our evidence would be in already for the punishment phase.

15         **THE COURT:**  So what?  One or two days?

16         **MR. HALL:**  Yes.  Maybe a little longer.  Maybe a

17  week, but I think that's stretching it.  I just don't want to

18  say one or two days.

19         **THE COURT:**  All right.  We'll say one week.  And then

20  for the -- for the defense, what do you think?

21         This is assuming that -- well, all right.  Assuming

22  that I don't -- is it still possible that Mr. Milburn is going

23  to be -- you're going to seek the death penalty for him?

24         **MR. FRENTZEN:**  Yes.

25         **THE COURT:**  Is that still on the table?

1    **MR. FRENTZEN:**  It is, your Honor.  I don't mean to

2   backbench Mr. Hall.  I'm trying to be cautious here.  I know

3   the Court's trying to make an estimate.  I just want to -- the

4   main issue in the punishment phase is, as I said, with six

5   homicides in the case, and victims' families, along with

6   possibly other things, I just want to cautiously say the

7   possibility of a second week -- because I know the Court here

8   is trying to -- I just --

9        **THE COURT:**  All right.  Let's say two weeks.

10        **MR. FRENTZEN:**  Thank you.

11        **THE COURT:**  All right.  How about on the defense

12   side?

13        **MR. BURT:**  I think, as we indicated before, probably

14   three weeks per defendant would be a reasonable working

15   estimate of how long it would take us to get in our individual

16   cases and mitigation.

17        **THE COURT:**  Now, maybe hard -- let me go back a bit.

18   We skipped over a period for deliberations.  I expect the jury

19   to carefully go through all the evidence.  In your judgment,

20   what is an average length of time we would expect a guilt phase

21   for deliberations?

22        **MR. HALL:**  I don't know if my experience tells me

23   exactly, but with that much evidence, I would think it would

24   take several days before they would be ready to actually vote.

25   So we would think a week would be reasonable; that within a

1 week, they could get to the bottom of that.

2        **THE COURT:**  A week?

3        **MR. HALL:**  And if they didn't, we'd have a problem.

4        **MR. TAMBURELLO:**  I would think a week to two.

5        **THE COURT:**  We're going to say two weeks, because I'm

6 trying to come up with a -- I want to advise the prospective

7 jurors how long they might be here.  So all right.  So then on

8 the -- and then on the penalty phase, how long would they be

9 here?  Same?  One week?  Less?

10        **MR. HALL:**  Really don't know.

11        **THE COURT:**  Ooh, I'm going to say one week, because I

12 think after they've already deliberated once, they will have

13 digested all of the information more.  So I'm going to say one

14 week.  So if you add all that up -- say you go eight, two,

15 eleven, and one.  That comes out to 22 weeks.

16        **MR. BURT:**  One thing the Court did not account for in

17 that estimate is rebuttal.  And especially in the penalty

18 phase, there generally is some sort of rebuttal, especially to

19 the expert testimony.

20        **THE COURT:**  All right.  Twenty-three weeks.  So with

21 all that, 23 weeks would be how long?  That's six months.  So

22 we're going to just say round it off to six months, starting

23 from when the evidence is presented.  Does that sound like a --

24 in other words, I wouldn't want somebody to come in and say,

25 "I've got to get off this jury because you told me six months,"

1 but do we have 90 percent confidence in six months?

2     **MR. HALL:**  Yes.  And again, I would say that the

3 Court in the estimate -- overall estimate by everyone, I think

4 we've erred on the high side.  And I think that's the right way

5 to go.  I think six months would be maximum.

6     **THE COURT:**  I do want to err on the high side, but I

7 don't want to err so much that it's a ridiculous estimate; but

8 on the other hand, I want us -- 90 percent of the time I want

9 us to be sure that we meet it, so that we don't have a big

10 problem with the jurors.

11     **MR. HALL:**  I would say that it would be my offhand

12 reaction that if we picked another number lower -- say four

13 months -- that there's not going to be -- we're not going to

14 lose very many, if any, jurors saying they can be here for four

15 months, but they can't be here for six.  So it seems to me that

16 six is a good estimate.

17     **THE COURT:**  What does the defense say?

18     **MR. BURT:**  Well, the big unknown for us, your Honor,

19 is the issue that we've explored many times, which is the need

20 for mid-trial continuances to do investigation based on

21 discovery that we're not going to receive until after a certain

22 witness has testified.  And the Court all along has said you'd

23 be prepared to grant those kind of continuances if we needed

24 to.

25     And we're --

1          **THE COURT:**  Well, that's true.  That's true, although

2    there are other ways to deal with -- for example, if -- this is

3    hypothetical, because I don't know the circumstances yet; but

4    if I feel that you need a continuance to do your

5    cross-examination, that witness is going to be put off for --

6    and then we'll bring in a new witness.  And then you can go out

7    and dig up your homework on that witness.  That -- and then we

8    bring him back to the cross-examination.  That would be one way

9    to do it, without losing any trial days.

10         **MR. BURT:**  It's -- that may be an alternative.  It's

11   just hard for us to get concrete about this without knowing

12   what we're dealing with here.  So the Court could have a lot of

13   alternatives, but I think our concern is that the Court not

14   inform the jury of an estimate which we're locked into, and

15   then we have a situation where, unbeknownst to us, we've got to

16   do a lot of work.  And the Court agrees:  yeah, this work's got

17   to get done now.  Through no fault of ours, we didn't get this

18   material until mid trial, and then you're stuck in a situation

19   where you told them six months, and now it's going to be eight.

20         **THE COURT:**  That's a legitimate consideration.  And

21   we could not promise them six months, but I think if we tell

22   them that that's the estimate, then it may be that we have to

23   go beyond six months.  If there's a -- but, you know, I'm not

24   going to -- I am going to grant a continuance if I think it's

25   needed in any given case --

1          **MR. BURT:**  Sure.

2          **THE COURT:**  -- if there's good cause for that; but on

3   the other hand, not every revelation is going to require a

4   continuance.  So -- and there are ways to deal with it so that

5   we don't lose trial dates.

6          **MR. BURT:**  No.  I understand that.

7          The only thing I'm suggesting is that, because of

8   that situation that's rather unique -- is that the Court is

9   going to need to have to leave some sort of escape valve there

10  with these jurors.  Our best estimate is six months, but things

11  could happen.  It could be longer.  We hope it won't be, but

12  given the present estimates, we think it will be six months.

13         And then, of course, perhaps part of the solution

14  might be for the Court to select a number of alternates, in

15  case we do run into problems with people who drop out.

16         **THE COURT:**  We have a small jury box.  How many --

17  let's think about alternates for a minute.  How many alternates

18  do we think we need?

19         **MR. HALL:**  Six.  I would think six would be, perhaps,

20  a minimum.  Six or eight.

21         **THE COURT:**  Where would we seat them?

22         **MR. HALL:**  Just because things that could happen to a

23  person.

24         **THE COURT:**  They would just be on the front row, back

25  there?

1          **MR. HALL:**  Front row would be a good suggestion, I

2    think.

3          **THE COURT:**  That means the big screen is going to

4    have to be over here, so the jury can see it.  What do you

5    think, over there, is the number of alternates?

6          **MR. HALL:**  I think eight would be a minimum.  I think

7    the Court should err on the side of more, not less, because of

8    the length of this trial, and the effort that's going to go

9    into it.  We don't want to get at the end of the process, and

10   find out we've run out of jurors.  So I would say at a minimum

11   it should be eight, and perhaps more.

12          I realize there are logistical problems seating that

13   many people.  We don't want to have to mis-try the case because

14   we've run out of jurors.  Things do happen in these lengthy

15   cases, as the Court knows.

16          **THE COURT:**  Okay.  Eight may be the number,

17   although -- all right.

18          Now, if we were to send this out today -- so this is

19   August.  We're not going to send it out today, but I'm just

20   trying to work out the number of days.  How long do we let

21   the -- how much time do we give the jurors to fill out the

22   questionnaire?

23          **MR. FRENTZEN:**  Can I be heard on that, your Honor?

24          **THE COURT:**  Sure.

25          **MR. FRENTZEN:**  Because -- and actually, I've done

1  this process before.  And we're not in favor of sending out the

2  questionnaires.  And the manner in which we had set up to do it

3  with Judge Chesney -- the manner in which I've done it

4  before -- is that the jurors are actually brought in in stages

5  to the courtroom to be instructed, and to fill out the

6  questionnaires there.

7        And the reason for that is if the questionnaire

8  relates to the capital-punishment issue, and so on, I think

9  it's the goal of everybody involved to get people's responses

10 that they have at the time when they're in a courtroom setting,

11 and understanding that they're responding to the questions

12 under oath, and so on; whereas if they're sent out, there's the

13 opportunity for, among other things, discussion with other

14 individuals.  And there's not the same sense -- I don't

15 think -- of the importance of the oath as there is when they're

16 filling them out in the presence of the Court.  And that would

17 be -- so --

18        **THE COURT:**  All right.  Let's hear from the -- let's

19 hear from the defense.  What -- do you disagree with that?

20        **MR. SATRIS:**  No.

21        **MR. BURT:**  No, your Honor.

22        **THE COURT:**  All right.  Can we at least do this much,

23 then?  Can we at least send out a questionnaire that would say,

24 maybe in one sentence, what the case is about?  Then say this

25 trial may last six months; possibly more, and what our time

1   schedule will be.  And ask if there's any hardship.

2          Can we send that out, and then excuse those people

3   for whom there would be a hardship?

4          **MR. FRENTZEN:**  I have no problem with the -- with the

5   notification regarding how long the case will take, nor with

6   the hardship issue.

7          I think we may have -- I mean, I guess if it's a very

8   general statement about what the case is about, that would be

9   okay; but anything more than that, I think, would be

10  problematic.

11         **MR. BURT:**  We don't have any problem with that,

12  your Honor.  How would the Court contemplate exercising the

13  excusals?  In other words, would the parties get together and

14  meet and confer on which ones they agreed upon, and then the

15  Court would rule?

16         **THE COURT:**  It would be -- you could do it that way.

17  I -- in other cases where we expect a long trial, we have left

18  it up to the jury administrator, except in close calls, where

19  the jury administrator asks me; but I would be -- it would be

20  even better if the two sides would go through the responses,

21  and then serve it up to me.

22         Now, this would be very limited.  You'd have just

23  their name.  And you wouldn't be able to go out and do, like --

24  you wouldn't be -- I wouldn't want you to say, "Okay.  Let's go

25  check up on this person," and try to do some kind of

1  demographic or ZIP code analysis on them, and then say, "We're

2  going to fight to keep this" --

3          It would be strictly:  have they stated a good reason

4  to get out of the service --

5          **MR. BURT:**  Sure.

6          **THE COURT:**  -- on a long case like this?

7          And if the answer to this is, yes, they have, then

8  they ought to be excused.  If they haven't, then they should

9  not be excused.

10         So that's what I'm assuming you have in mind, is you

11  would go through and say, "Yes," "No," "Agree," "Don't agree,"

12  and then give me a stack that you want me to decide on.

13         **MR. BURT:**  That is what I had in mind.  I think it

14  does -- I've used that system in other cases.  I think it is an

15  efficient way to cut down the amount of time the Court has to

16  devote to --

17         **THE COURT:**  All right.

18         **MR. BURT:**  -- that issue.

19         **THE COURT:**  Okay.

20         **MR. FRENTZEN:**  That's what we did with Judge Chesney

21  as well, your Honor, is to meet and confer and agree on

22  appropriate strikes based on the questionnaires.

23         **MR. BURT:**  And we think the Court would need to put

24  in the -- in the questionnaire when the Court proposes to begin

25  the trial, because --

1          **THE COURT:**  Mm-hm, all right.

2          **MR. BURT:**  -- for the reasons we've discussed.

3          **THE COURT:**  Let's see.  Let's work this out right

4    now.  It would be a statement.

5          By the way, I don't know that I can promise people

6    that this will be under seal and not, you know, the press.  And

7    there are certain First Amendment rights that I could say, "To

8    the extent allowed by law, I could promise that," but the Ninth

9    Circuit's got some rules about public access to records.  And

10   jurors might not be able -- might not be able to keep

11   everything under seal.

12         The other question is -- Mr. Hall, you're familiar

13   with this with that other case -- is whether or not the jurors

14   should be identified by name.  What are your views on that?

15         **MR. HALL:**  Yeah.  I think, given the number of

16   homicides, your Honor, and the reticence that perhaps a juror

17   would feel, given that scenario, we think that an anonymous

18   jury would be appropriate here.

19         **THE COURT:**  What does the defense say about that?

20         **MR. BURT:**  Well, we oppose any -- we filed an

21   opposition to that motion.  We didn't understand the Government

22   was renewing that motion.  The Court, as you recall, had said

23   that we should renew whatever motions we were going to renew

24   regarding jury selection.  It was an earlier motion for an

25   anonymous jury.  It was not renewed.  We didn't realize that

1   was on the table --

2          **THE COURT:**  All right.  Well, that's a fair point.  I

3   did bring it up out of left field.

4          **MR. BURT:**  -- but we do oppose it.

5          **THE COURT:**  Well, I'll tell you what I'll do.  Rather

6   than try and work out the language here, I may get with the

7   jury administrator and come up with a proposal, and then send

8   it to you.

9          Okay.  Let's turn to some of the types of substantive

10  questions.  Now, this would be for later questionnaire.  Let's

11  say that we go through this process.  We get -- I'm making up

12  these numbers.  Let's say we send it out to 400.  Tell me.  How

13  many do you think we need to send this out to, in order to come

14  up with a panel at the end that will have the time, and so

15  forth?  Four hundred?  How many?

16         **MR. HALL:**  That sounds like a reasonable number,

17  your Honor.  We don't know the number of peremptories that the

18  Court's going to ultimately rule that the parties will have

19  yet, but 400 seems to be plenty.

20         **THE COURT:**  Well, I suspect if we send it out to 400,

21  at least 200 will say they can't serve that long, and probably

22  have a good enough reason to -- well, what's been your

23  experience on how many can serve for a trial this long?

24         **MR. BURT:**  I think you'll get at least 200.  And I

25  think you'll also get a number of questionnaires that will not

1 even be returned.  And the jury commissioner's probably got

2 better information on that.

3          THE COURT:  Well, how many do we need who are cleared

4 of at least hardship, and are willing to serve, subject to *voir*

5 *dire* on all of the issues you want?  How many, in your

6 judgment, do we need in order to seat a jury?

7          Now, I haven't decided on the number of peremptories

8 yet.  I know that affects the analysis, but give me some

9 ranges.

10          MR. BURT:  I think 400 to 500.

11          THE COURT:  At the outset?

12          MR. BURT:  Yes.

13          THE COURT:  What does the Government say?

14          MR. FRENTZEN:  I think that sounds right, Judge.  I

15 mean --

16          THE COURT:  I'm going to say 500, so that we get 500

17 questionnaires.  These are hardship questionnaires.

18          All right.  So now let's assume that -- I'm making

19 this number up, but let's say we have 200 that come into the

20 courtroom that have not been excused.  We finally get 200 here.

21 And then we -- your idea is then we give them a questionnaire

22 and ask them to go fill it out?  Is that it?

23          MR. FRENTZEN:  That's correct.  We have them fill it

24 out here, your Honor.

25          THE COURT:  Right here in court?

1        **MR. FRENTZEN:**  That's correct, under oath.

2        **THE COURT:**  Now, why do we need so many questions?

3   This is huge.  This is like a phone book here.  This would take

4   all day to fill out.

5        **MR. FRENTZEN:**  Judge, that's --

6        **THE COURT:**  Maybe even longer than all day.  So what

7   is the view of the Government on this?

8        **MR. FRENTZEN:**  Well, I'm certainly in favor, I think,

9   of limiting -- I don't know what questionnaire that the Court's

10  got in front of it; if it's the defendants' proposal.

11       **THE COURT:**  Yeah, that's the defendants' proposal.

12       **MR. FRENTZEN:**  Well, the Government had provided a

13  sort of an example of a go-by that was used in a prior capital

14  case.

15       **THE COURT:**  Well, wait a minute.  I don't have that.

16       **MR. FRENTZEN:**  It's on our filing -- our initial

17  filing to what was essentially the same motion.  It's

18  Document 1233.

19       **THE COURT:**  Here it is.  It's called, "Preliminary

20  Instructions for Questionnaire."

21       **MR. FRENTZEN:**  I believe that's correct, your Honor.

22  It was attached as an exhibit.

23       **THE COURT:**  All right.  Is yours any shorter?

24       **MR. FRENTZEN:**  Maybe it's not.  I don't know.  Well,

25  I'm sorry, Judge.  This was --

          THE COURT:  Well, here.  Let me hand down to you what
I have indicated as Government preliminary instruction juror
questionnaire.  Is that the document you're referring to?

          MR. FRENTZEN:  That is, but it's not all
questionnaire, your Honor.  If you skip to -- the back part of
that is the actual questionnaire, which is ten pages in length.
Now this is, of course, from a different case, so it would need
to be modified; but this was something that was used before.
So it's only --

          THE COURT:  All right.  So this is a --

          MR. FRENTZEN:  It's only a ten-page questionnaire,
your Honor.

          THE COURT:  All right.  Okay.  So let's hear from
the -- has the defense had a chance to look at the -- this is
one from the Savannah Division of the Southern District of
Georgia.  So what's -- what does this fail to get at?  What are
the problems with the Government's proposed questionnaire?

          MR. BURT:  Well, I don't think there are any -- in
general, any problems with it.  It's just our position it
doesn't go far enough in asking the kinds of questions that
both sides would want answers to.

          THE COURT:  Maybe -- and I'm very open to adding to
it.  What I'm trying to get at are what are the -- if this
proposal by the Government is too short, then what are the
types of questions that you feel are most important to include

1 that are not there, so we can start considering a slightly

2 longer questionnaire?

3      **MR. BURT:** Okay.

4      **THE COURT:** My general impression, Mr. Burt, is that

5 what you submitted is so long, that it's going to overwhelm the

6 jurors, and we will get less valuable information as a result.

7      **MR. FRENTZEN:** And if I could, Judge -- I mean, I

8 think this goes also to something else that was raised at the

9 very beginning of this hearing by Mr. Burt. And that is

10 questioning that relates to specific facts or fact-type

11 scenarios that, at least, in my review of the defense proposal,

12 there was a lot of that. And it's the Government's view that

13 none of that is appropriate here. I mean, the real question

14 is: can the jurors -- will the jurors follow the Court's

15 instructions?

16      And, to the extent that questions start dipping into

17 particular factual scenarios, it's the Government's view that

18 those types of questions are inappropriate. And that's why the

19 Government's proposed questionnaire is somewhat briefer, I

20 think, is because it doesn't have those kind of

21 testing-the-water-type questions about particular facts which,

22 in the Government's view, is not an appropriate use of *voir*

23 *dire*.

24      **MR. BURT:** Judge, one of the reasons I suggested that

25 perhaps the most efficient way to proceed on the jury

1 questionnaire was for the Court to give us some general

2 guidelines, and then for the lawyers to meet and work on a

3 joint proposed questionnaire, is that I think we could come to

4 some agreement about some of the contested issues --

5         **THE COURT:** Well, all right.

6         **MR. BURT:** -- not burdening the Court with question

7 by-question-analysis here, because I think there is a lot of

8 common ground here. And I think both sides do realize that

9 it's in everybody's interest to get as much information as

10 possible.

11         Our questionnaire is 21 pages. His is 10. I think

12 we can meet somewhere in the middle, in terms of the length of

13 this questionnaire. It's not extraordinarily long, as capital

14 jury questionnaires go. I've had hundred-page questionnaires

15 that jurors have sat and filled out without too much complaint.

16         So we have tried to get it down to what we need here,

17 but I don't think we're that far apart. And I think if the

18 Court could give us some time to get together with the

19 Government, we could come up with a joint proposal; perhaps

20 with some disagreements, but I think that that might be the

21 best way to go on -- in terms of the questionnaire.

22         **THE COURT:** Give me a specific example of something

23 that you want the Court's guidance on.

24         **MR. BURT:** Well, one area, I think, would be

25 publicity. We have on our questionnaire, beginning at page 9

1   and 10, some questions about publicity.  And I think the --

2        **THE COURT:**  Well, of course, we've got to ask if

3   they've heard anything about -- why does the Government object

4   to that?  You don't object to that, do you?  Have you read or

5   heard anything about this case, and --

6        **MR. FRENTZEN:**  I don't have any objection to that at

7   all, your Honor.  In fact, I mean, it's been a little while

8   since I looked at this, but I'm not aware that we didn't ask

9   about -- maybe we did.  Well, yeah.

10           Have you heard or read anything about

11           this case before today?  Yes, no, or not

12           sure.

13           Please state what you have heard or

14           read, and the source.

15           Has anyone ever talked to you about

16           this case before today?

17           So, I mean, that's not missing from ours.

18        **THE COURT:**  Well, all right.  On 54, I don't think --

19   I think we're going to ask the jurors if they've heard anything

20   about this case.  And we can ask them if they've heard, if

21   they've read, they've seen -- so, of course, we're going to ask

22   that.  We're going to ask if they know any of the witnesses.

23   We've got to ask that, too.

24           So -- but now the way you -- what do you think?

25   Number 56.  This case involves allegations of membership in the

1   Down Below Gang, murder, car jacking, drug dealing, and use of

2   guns.  Do these allegations cause you to doubt, even slightly,

3   your ability to be fair and impartial?

4           What's wrong with that type question, if anything?

5   I'm not suggesting there's anything wrong, but do you have any

6   objection to that?

7           **MR. FRENTZEN:**  Generally speaking, no, your Honor.

8   And I think we probably have that.  Again, in ours, it is:  did

9   the nature of the charges in this case -- or based on the

10  nature of the charges in this case, is there any reason why you

11  feel you couldn't be fair and impartial?

12          I mean, that's a standard question that's asked in

13  every case.  You know.  I can flip through mine, and see if I

14  can find --

15          **THE COURT:**  Subject to you working out minor

16  differences on wording, it seems to me that the types of

17  questions that are on your pages 9 and 10 concerning publicity

18  and discussion -- those seem okay.

19          So what next do you need the Court's guidance on?

20          **MR. BURT:**  On page 13 of our questionnaire -- 13 and

21  14 and 15, there are attitudinal questions about the criminal

22  justice system in general.  There are some death-penalty

23  questions in there.

24          **THE COURT:**  This is the one that goes to this,

25  sideways?

1      **MR. BURT:**  Yeah, correct.  And there is some racism,

2 gang questions in there.  The Government has some general

3 race-attitude questions in its questionnaire.  I don't think

4 it's as detailed as this.

5          So it would be our proposal to include something like

6 this.  It doesn't require a lot of time to fill out these sorts

7 of questions.  The Government apparently agrees, because their

8 format are similar questions or exactly the same.

9      **THE COURT:**  All right.  What does the Government say?

10      **MR. FRENTZEN:**  Well, I just -- in general, in terms

11 of the topics, I don't have an issue.  And I guess I haven't

12 looked again back through all these multiple pages of topics to

13 say whether or not I agree or disagree.

14          My sense is that I probably disagree with something,

15 but again, I mean, you know, the purpose is really to be asking

16 whether or not people can follow the law.  The purpose isn't

17 necessarily to be rating them on some kind of a, you know,

18 scale in terms of trying to predict their sensibilities.  I

19 think it's more whether or not they can appreciate and follow

20 the law.

21      **THE COURT:**  What's the point of "Slightly disagree,"

22 "Disagree strongly"?  Isn't that like a rating system?  So

23 that -- let's say you had somebody that says, "We must have the

24 death penalty."  And they write, "Strongly agree."

25          And then somebody else says, "Slightly agree."

1  What's -- what difference does it make if they slightly or

2  strongly agree?

3       **MR. BURT:**  Because one of the things this the Court

4  has to decide when it's deciding whether or not the jurors have

5  to be dismissed for cause is whether their views on capital

6  punishment substantially impair -- I think is the language from

7  the cases -- substantially impair their ability to be fair and

8  impartial jurors.

9       And on that question, as we start going through the

10  process, the Court is going see with individual jurors, it's

11  going to be a lot of ambiguity.  And so the more information

12  the Court has about someone's views and the strength of those

13  views on particular topics, the better the Court's going to be

14  in a position, I think, to rule on challenges for cause.

15       So somebody who says, "Well, I'm only weakly in favor

16  of the death penalty.  I can be fair to both sides, and

17  consider it" -- that's one end of the spectrum.

18       Somebody who says, "I strongly agree that there

19  should be the death penalty" -- in connection with other

20  answers, it might suggest a challenge for cause.

21       And so I think it is important for the Court to

22  characterize, somewhat, the strength of the attitudes.  You're

23  not rating jurors here; you're rating their attitudes and the

24  strength of those attitudes in order to assess whether there is

25  some challenge for cause here.

1           **MR. FRENTZEN:**  Can I be heard on that, your Honor?

2           To a certain extent -- well, I agree with the first

3  part of what Mr. Burt says, which relates to feelings about

4  capital punishment.  I mean, that is an area that we need to go

5  into.

6           The problem with this is, if the Court looks at this,

7  most of this does not deal with the death penalty.  Most of

8  this is:

9                How do you feel about the following

10               notions under the law?  A defendant

11               arrested for murder is presumed innocent.

12          Well, what the heck has that got to do with the death

13  penalty?

14          This whole first page, other than, maybe, one of

15  these questions, is a rating system on some of the more -- just

16  basic notions of criminal law.

17          You go on to the next page.  It's the same thing,

18  things like:  prison costs too much; only a guilty person would

19  object to a search of their home, car, or person.

20          I mean, this has got nothing do with what Mr. Burt

21  just talked about.  This is a way of rating people in terms of,

22  you know, their overall feelings about the criminal justice

23  system, and perhaps their political leanings.  This is totally

24  inappropriate.

25          **MR. BURT:**  Well, except Counsel just said that the

purpose of the questionnaire -- the purpose of the whole

selection process -- is to find out whether the jurors can

follow the law.  And, of course, there's law other than the

death penalty that's applicable here.

**THE COURT:**  Yeah, but in an ordinary criminal cases,

we don't try to rate the jurors in this manner.

**MR. BURT:**  No, but if the Court -- for instance, in

answer to that first question, "A defendant arrested for murder

is presumed innocent" -- if a juror says, "I strongly disagree

with that principle," and upon questioning, says, "I'm not

going to abide by it," that juror is subject to challenge for

cause, even though it's got nothing do with the death penalty.

Why?

Because the presumption of innocence is a rule of law

that the jurors have to follow.

**MR. FRENTZEN:**  Of course, you ask them the same way

you do in every other case.  This -- the following is the law.

Will you be able to follow that?  Do you have a problem

following that?

You don't need to rate a person about their personal

feelings related to that law; it's just whether or not they

appreciate it, and can follow it.

**THE COURT:**  Look.  Here's what I suggest you do.  I

think this is -- the Government is mostly right on this.  I

would limit the questions to -- we're going to cover the

presumption of innocence.  No one has to testify.  I do that in
every case, and I explain that's an important right.  And I ask
if -- does anyone here think that that -- you know, he would
say, "There are people out there -- maybe some of you -- who
feel that in every case, somebody ought to testify, and that if
they don't testify, that indicates they're guilty.  Do you feel
that way?"

And then some people might raise their hand.  And so
I get at it in different ways.  And I was assuming we would do
all that on a group basis, not an individual basis.

But the questions that go to the death penalty
and/or -- versus some other kind of punishment, I'm okay with a
rating scale, but I would just do this.  I would say it would
be one choice in the middle that says, "No opinion."  You don't
have that here.  A lot of people aren't going to have an
opinion.  You say, "No opinion," "Agree," "Strongly agree," and
then "Disagree," "Strongly disagree."  So you have five
categories, instead of your six.

**MR. FRENTZEN:**  What?

**THE COURT:**  And limit that to the
death-penalty-related questions.  Is that all right?

**MR. FRENTZEN:**  I'll have to see what the
death-penalty-related questions come out to be, but --

**THE COURT:**  Here.  I'll go down some of these here.

"The death penalty prevents crime."

1          "We must have the death penalty."

2          "A life sentence in prison really doesn't mean a life

3 term in prison" -- although that is incomprehensible.  That

4 doesn't mean much, but I know what you're getting at.

5          Actually, maybe "Prison costs too much" is indirectly

6 a factor there.  So I guess you could put that one.

7          Most of these don't relate to the death penalty.

8          Yes, sir.

9          **MR. FRENTZEN:**  I'm sorry, Judge.  That doesn't seem

10 to relate to the death penalty at all.

11          **THE COURT:**  "Prisons costs too much"?

12          **MR. FRENTZEN:**  Yeah.

13          **THE COURT:**  "Prison costs too much.  Just execute

14 them."  I've heard that from a lot of people.  I think that's a

15 legitimate question to ask about the death penalty.

16          **MR. FRENTZEN:**  Well, I respectfully disagree, Judge.

17          **THE COURT:**  "Prison costs too much, so it's better to

18 execute criminals."

19          **MR. FRENTZEN:**  They should be stricken, but the point

20 is, Judge, this rating system is related to everything across

21 the spectrum of the criminal justice -- I mean, that's the just

22 not --

23          **THE COURT:**  Not across the whole spectrum.  I'm

24 saying it's got to be related to the death penalty -- the

25 rating part.

1     **MR. FRENTZEN:** But there are -- and I'm sure counsel

2 can come up with about a million different things that you can

3 in some way connect to the death penalty.

4        If I could respectfully just submit what the

5 Government has that regards a rating-type question is in our

6 proposed questionnaire on page 7.  And I think that's as far --

7        I mean, the Court was asking about:  how do we limit

8 some of these questions?  And why are we asking all of these

9 questions?

10        **THE COURT:**  Yeah.

11        **MR. FRENTZEN:**  I mean, an argument could be made for

12 all kind of questions, but I mean, I think -- and following

13 this, I think we've all agreed we're going to have an

14 individualized *voir dire*.

15        The issue is:  how many different things can we

16 relate to the death penalty so we can try and get some kind of

17 rating system on these people?

18        **THE COURT:**  Look.  The point I was getting at, which

19 mostly was in agreement with you, Mr. Frentzen, but I -- was

20 that of all of these questions that are at pages 13, 14, and 15

21 that are in the defense proposal, I agree with you that most of

22 them have nothing to do with the death penalty, and they

23 shouldn't be covered in this questionnaire that supposedly gets

24 at the death penalty; but some of these do.

25        And I think the ones -- you know, you just disagree

1  with me, but the things about, "Prisons cost too much" --

2  that's a -- that conceivably goes to a death-penalty opinion.

3  **MR. FRENTZEN:**  Well, I guess we'll have to get

4  together with counsel and see how many we -- I'm just trying to

5  limit the questions.

6  **THE COURT:**  Well, I'm thinking 20 percent of those

7  questions, maybe, relate to the death penalty.  I'm going to

8  give you some more.  I haven't finished.

9  **MR. FRENTZEN:**  I don't mean to interrupt, except I

10  have Judge Patel right now at 10:00 o'clock.  So Mr. Hall is

11  going to have to handle this.

12  **THE COURT:**  All right.  Whatever, but if Mr. Hall

13  agrees to something, don't come back later and say he shouldn't

14  have agreed to it.

15  **MR. FRENTZEN:**  If Mr. Hall agrees to it, then I'm

16  fine with it, Judge.

17  **MR. HALL:**  That may or may not be true.

18  **MR. FRENTZEN:**  We'll do what he says.

19  **THE COURT:**  "The death penalty is used against

20  African Americans more often."  That's a legitimate question.

21  Number 102, "Drug dealers who kill should get the

22  death penalty" -- I think that's a legitimate question for that

23  five-type rating scale.

24  Okay.  What's the next one, Mr. Burt?

25  I've given you some guidance there.

1          **MR. BURT:**  I think that's helpful, your Honor.  And

2     that's what I have.  The Court outlined all sorts of concerns.

3     I think we can come to some resolution here.

4          **THE COURT:**  All right.  So can you all meet and

5     confer and come up with something that is not going to -- I

6     would say, much closer to the short than the long?

7          **MR. BURT:**  Sure.

8          **MR. HALL:**  Yes, we can.  I'm sure we can.

9          **THE COURT:**  All right.  Good.

10         Now, to go back to your other motions, let me just

11    tell you the general inclination that I have.  And I will try

12    to get out a written order on this, but unless you want to

13    argue more now -- Mr. Burt, you said you thought the -- this

14    was adequately briefed?

15         **MR. BURT:**  I do, your Honor.

16         **THE COURT:**  All right.  You wanted to preclude

17    punishment-related questions altogether.  And that motion will

18    be denied.  I will get out an order that explains that.

19         And then -- all right.  You wanted to defer death

20    qualification until after the first phase.  I think that's

21    highly impractical.  I don't see how we could do that without

22    having to empanel virtually the entire roomful of jurors.  And

23    we just can't do that.  So that part of your motion is going to

24    be denied.

25         Case-specific questions -- the -- let me give you a

guideline, because this comes up with -- in a lot of -- all the

time.  And purpose of *voir dire* is to mainly find out if the

person has had some life experience that would possibly or

legitimately cause them to have a preconceived attitude.  So

we're trying to find out about attitudes and opinions.

And you're not trying to use *voir dire* to find out

how they would vote on the case.

At the -- so you've got these two opposite purposes.

And maybe it's like a spectrum.  So it's improper to say to a

jury, "If we were to prove to you A, B, C, and D, would you

view that evidence as sufficient for life in prison, as opposed

to death?"

That would probably be improper, just as it would be

improper for the Government to say, "If we prove to you A, B,

C, and D, would that be enough for you to find the death

penalty?"

Seems to me that -- so -- but sometimes I have found

that there will be very specific sensitive things in a case.

For example, some of your questionnaire got at this.  "In some

cases, graphic, gruesome photographs could be so -- have such

an effect on a juror, that it would cause them difficulty in --

even in deliberating or paying attention to the rest of the

evidence in the case."

So there are fact-specific examples.  And we can all

come up with -- where I think everyone would agree, or most

1  people agree, that it's probable -- it's legitimate to ask

2  about that fact-specific consideration.

3         So I honestly think that this is something that has

4  to be a question-by-question determination.  The general -- I

5  tried to give you what the general guideline is.  We're trying

6  to get at attitudes and opinions; life experiences that lead to

7  attitudes.

8         You know.  "Have you ever had a family member

9  killed?"  "Have you ever had a family member hooked on drugs,"

10 or "Have you ever had a family member injured or prosecuted by

11 the Government?"  These are the kinds of life experiences that

12 generate attitudes; but anything that gets close to, "How are

13 you going to vote if we show you the following evidence," is

14 improper.

15        And in between there, there are going to be a few

16 gray areas.  So with that, that's the best I can do in advance,

17 without giving you -- without knowing the exact question you

18 want to ask.  So all right?

19        **MR. SATRIS:**  Yes.

20        **THE COURT:**  Mr. Satris.

21        **MR. SATRIS:**  If I could just respond to that,

22 your Honor.

23        **THE COURT:**  Sure.

24        **MR. SATRIS:**  I'm in total agreement with you on

25 everything you said, but the gray area -- what -- one of the

things that we're going to be most interested in finding out

the attitudes of the jurors are:  can you meaningfully consider

life if you have found, for example -- whatever their attitudes

may be -- that there's been not only murder here, but there's

been multiple murder?  We're talking about the murder of an

infant, if we get to the penalty phase.  And so we certainly

want them to be aware of those case specifics, so they can

answer that question in an informed way.

And in a way, that gives us some intelligence that --

I am not so adamantly in support of the death penalty that --

that, despite the fact that there is multiple murder here, I'll

consider life, but I'm so opposed to murder, murder is so

terrible in itself, maybe I could consider it in that case, but

not in the murder of an infant, or not in the murder of three

individuals.

**THE COURT:**  What does the Government say to that?

**MR. HALL:**  I think I agree in general with that,

your Honor.  I think that that's part of the process that we're

going to be agreeing to here; is that we'll go through each

question.  And perhaps we will agree as to --

And I understood the Court's concerns that it should

be shorter; that we should deal with items that would reflect

their overall ability to follow instructions, and not how they

will ultimately vote.  And I think we can come to a consensus

on most things.

1    And if there is something that we disagree on, we'll

2 submit that to the Court -- if the defense really wants a

3 question, and we really don't.  And I think that's probably the

4 best way to do it.

5    But as far as generally, I agree that that might be

6 something that the Court should be concerned about and the

7 parties should be concerned about:  are there types of

8 homicides that would reflect an inability to follow the Court's

9 instruction.

10    **MR. BURT:**  Could I add one thing, your Honor?

11    **THE COURT:**  Wait a second.  I'm just thinking.

12    **MR. BURT:**  Sure.

13    **THE COURT:**  Mr. Satris, how would you phrase the

14 question to the jury, assuming this is in the questionnaire;

15 but even if it's in open court, how would you phrase that to a

16 jury?

17    **MR. SATRIS:**  Well, I mean, if I was going to give the

18 full, it would be, you know -- you know what the charges are

19 here.  If we're at a penalty phase, you found all -- you know,

20 you may have found all" --

21    **THE COURT:**  They may not have found them all.

22    **MR. SATRIS:**  No, they may not have, but you may have

23 found them all true.

24    Can you still meaningfully consider a life sentence,

25 if you have found there's multiple murder that involves a

1   child; there's conspiracy to murder thereafter?  Can you

2   meaningfully consider a life sentence?

3           And then also I would want to find out their

4   attitudes towards types of mitigation.

5           **THE COURT:**  All right.  Well, let's pause.  Let's go

6   back to -- I'm going to suggest some language that is not in

7   any way meant to be final, but wouldn't we have to say

8   something like this?

9           In the event that the Government were able to prove

10  all of the murders and drug dealing that is alleged in this

11  case --

12          And you might say --

13          Is it six or eight homicides?  Six homicides?

14          **MR. SATRIS:**  Six.

15          **THE COURT:**  And if you wanted to put in there,

16  including the homicide of Baby Molex, then we would have a

17  penalty phase that would -- at which time the jury would have

18  to decide whether or not the Government has proven

19  circumstances warranting the death penalty.  At that phase, the

20  Court would give you instructions on how to weigh various

21  circumstances in the case, including potentially mitigating

22  evidence, or evidence mitigating against the death penalty.

23          So you'd have to tell them there's going to be

24  instructions on this, and then say, "Would you be able to

25  follow those instructions fairly and consider all of the

1  evidence if the Government had proven six homicides, or would

2  you automatically" --

3        See, I'm having some trouble saying it out loud, but

4  the general point is:  will they be able to follow instructions

5  that would require them to take into account mitigating

6  evidence?

7        **MR. SATRIS:**  Yes, but I think it's important to get

8  their attitudes first, and then we can later develop what the

9  instructions are going to be, to see whether, under those

10  attitudes, they would be able to --

11        **THE COURT:**  Well, but here's the thing.  See, we're

12  not telling them that.  If we just say, "If the Government

13  proves six homicides, including Baby Molex, will you be

14  strongly inclined for the death penalty?" -- that's what we're

15  skipping over, is not informing them that there's going to be a

16  whole phase where I tell them about mitigating evidence and

17  aggravating evidence, and how they are supposed to go about

18  putting it together, and weigh, and their duty then would be to

19  follow those instructions.

20        So to me the question is:  will the proof of the

21  liability so prejudice their ability to be rational that they

22  would be unable to follow those instructions?

23        **MR. SATRIS:**  To some degree, your Honor; but your

24  instructions aren't going to give them some mechanical way:

25  this is the way you do it.

1          **THE COURT:**  I know.

2          **MR. SATRIS:**  You turn the corner, right, and then you

3     turn left, and when you get there, you arrive at death or you

4     arrive at life.  I mean --

5          **THE COURT:**  If I tell them, "You've got to consider

6     as a mitigating factor" -- it's up to the jury, but a

7     legitimate mitigating factor is, say, an abusive childhood.

8     Assuming that the law bears that out, then if I -- if they hear

9     me say that, then, in my experience, the jurors will take that

10    into account as one of the factors they've got to consider; but

11    they don't -- they will not know that yet.  And if we just ask

12    them -- the question's got to be fairly presented, is what I'm

13    trying to say.

14         **MR. SATRIS:**  I agree with that, your Honor.  So maybe

15    we'll just --

16         **MR. HALL:**  Our questionnaire, page 8, Questions 34

17    and 35, I think, deal essentially with that.  "If the defendant

18    or if the defendants were found guilty of a capital count --"

19    and it could be any or all capital counts "-- and the evidence

20    and mitigating factors convince you that life imprisonment

21    without possibility of release or parole is appropriate, could

22    you vote for it?

23         Thirty-five is, "If the defendant were found guilty

24    of any or all capital counts, would you automatically vote for

25    life imprisonment without the possibility of release or parole,

1  regardless of the facts and aggravating evidence?"  I think

2  that's -- page 8 of ours; page 50 of 52, Document 1233.

3      **THE COURT:**  Well, that comes close --

4      **MR. HALL:**  Right.  And I think we can --

5      **THE COURT:**  -- but I do think that we need to -- I

6  think we ought to say if the defendant were -- it's legitimate

7  to say, "If the defendants were found guilty or a defendant

8  were found guilty of the murder of Baby Molex, would you

9  automatically vote" -- because there are going to be people in

10 this district, at least, who would say, "Yes, they should go --

11 they should be put to death for murdering an infant."  And I

12 think that's a legitimate, fact-specific question that you can

13 ask.

14     So because --

15     **MR. HALL:**  I don't disagree.

16     **THE COURT:**  -- because I think that that would be a

17 not commonly held -- but that would be enough of a commonly

18 held risk that we ought to cover that risk.

19     **MR. SATRIS:**  Yes, your Honor.

20     **THE COURT:**  So that would be a legitimate,

21 fact-specific consideration.

22     **MR. SATRIS:**  And then I think you also have to go on

23 the other end.  And, I mean, those questions that the

24 Government has just proposed are so abstract that they become,

25 in a sense, meaningless.

1      We would also want to ask the question, you know, if,

2  for example, going on with -- with the murder of the infant,

3  and they said, "No, we could consider there might be some

4  circumstances out there that are related to the killing that

5  would provide for life," I think it would be legitimate to say,

6  "Would you be able to meaningfully consider, as mitigation,

7  circumstances that might have nothing to do with the killing

8  itself, but would have do with the background of the

9  individual, or what they've done since they've been

10  incarcerated?"

11      And if you have somebody to say, "Well, no" -- like

12  you were saying childhood abuse or whatever" -- "that is not

13  something that I would consider.  I would reject that out of

14  hand in a case like this.  That, on its face, is -- I would not

15  give it any consideration."

16      **THE COURT:**  Well, not -- but if I told them -- see,

17  what you're leaving out is if I had told them that it was a

18  legitimate consideration.  So hypothetically, the way to phrase

19  this is that if the Court were to instruct you that an abusive

20  childhood is a mitigating factor that can be taken into account

21  in deciding between life and death, would you be willing to

22  give that good-faith consideration?  Answer "Yes," "No."  Why

23  wouldn't that --

24      **MR. SATRIS:**  I mean, I like the adjective, "the

25  good-faith consideration" or "the meaningful consideration," if

1 that becomes the case, whether they can follow that

2 instruction; but I think it's important to get their attitudes

3 first, so we can determine that the ultimate answer to that

4 question -- you know, whether there's some substantial

5 impairment there that they may -- yes, your Honor can tell me I

6 really have to consider it. I want to do what the Court says,

7 and so, okay, I'll consider it. I'll sit here and listen to

8 it; but we're going to have to assess whether they're -- they

9 are substantially impaired or whether they could give that the

10 kind of meaningful consideration that could result in a life

11 verdict, but you know, maybe we can postpone further --

12        **THE COURT:** I think the thing to do is for you to

13 come up with an agreed-upon set. And then each side can have

14 their un-agreed-upon additions. Then I'll just have to make

15 some judgment on it, but --

16        **MR. SATRIS:** Should we do that in some kind of joint

17 submission?

18        **THE COURT:** How about by the end of the week? Can

19 you do it by the end of the week?

20        **MR. BURT:** I don't think that's productive. I think

21 the Court started out with saying that, you know, it's really a

22 question-by-question basis. And at least in my experience,

23 these things tend to iron themselves out once you actually

24 start asking questions, and the Court makes rulings. And then

25 after you've done it for a while, you sort of get an

1 understanding of how --

2      **THE COURT:** Well, I thought you, yourself, were

3 proposing that you meet and confer with the Government.  Now

4 you're taking that back?

5      **MR. BURT:** I think we're talking about two different

6 things.  We're talking about meeting and conferring on the

7 questionnaire.  There are certain questions that -- I think we

8 can iron out the questionnaire.

9      I thought what we were now addressing was

10 case-specific questions.  Those would not necessarily be in the

11 questionnaire.

12      I thought we were discussing how the questioning

13 would proceed in court with individual jurors about their

14 death-penalty attitudes, and how far the Court would go, in

15 terms of allowing case-specific questions outside the

16 questionnaire.  And in that sense, I think it's probably better

17 that we agree on the questionnaire; and then, in terms of how

18 the questioning goes in court with individual jurors, that the

19 Court hear the question, and then --

20      **THE COURT:** All right.

21      **MR. BURT:** -- make a ruling.

22      **THE COURT:** Maybe let me give you -- let me say how

23 it works.  First, you two are going to come up with a

24 questionnaire, which is not going to be everything.  We've got

25 to have some verbal questions.

1          **MR. BURT:**  All right.

2          **THE COURT:**  So we come up with a proposed

3    questionnaire.  Can you do that by the end of the week?  I'm

4    asking you to do it by the end of the week.

5          **MR. BURT:**  I can't personally do it by the end of the

6    week, because I'm out of town this entire week.

7          **MR. TAMBURELLO:**  I can't, either.  I'm involved in a

8    no-time-waiver homicide prelim starting tomorrow.

9          **THE COURT:**  All right.  The end of next week.

10          **MR. TAMBURELLO:**  I'm taking my daughter to college.

11    And I must tell you that that's very important to me.

12          **THE COURT:**  Well, how about you, Mr. Burt?  You don't

13    have to have both of you do it.  How about you, by the end of

14    next week?

15          **MR. TAMBURELLO:**  I think it would be good if we both

16    could do it.

17          **THE COURT:**  All right.  The end of the third week.

18          **MR. HALL:**  All right.

19          **MR. BURT:**  That will do it.

20          **THE COURT:**  By the end of the third -- three weeks

21    from the end of the -- this is week one.  Today is Monday.

22    Next week is week two.  Then week three is -- this is week one.

23    Two.  So that would be September 5th.

24          **MR. BURT:**  Okay.  And should we do the same on the

25    proposed joint -- or proposed introduction?  Because we're kind

1  of far apart on that, as well.

2          **THE COURT:**  Yes, yes.  All right.

3          Now, on the actual procedure --

4       **MR. HALL:**  What was the day, again, your Honor?

5       **THE COURT:**  September 5th, meet, confer, and give me

6  the draft -- I mean the one you've agreed on -- with, then, a

7  list of one or two pages of the additional things that each of

8  you would like to add that you -- and this is without prejudice

9  to more specific questions for the jurors.

10         All right.  So then I'm thinking after we get the

11  hardships out of the way, they answer the questionnaire, maybe

12  there will be a group of people that you both can agree ought

13  to be excused.  Right?  Don't you think there will be some in

14  that category?

15         Then for the remaining people -- for the remaining

16  ones, I would like to come up with a procedure that would allow

17  me to ask, as an entire group, all the questions that don't

18  relate to the death penalty; and then have individual inquiry

19  on the death penalty.

20         Maybe -- and if anyone has heard anything about this

21  case, maybe we've got to have that also individually *voir*

22  *dired*.  What are your views on what is the most efficient and

23  fair way to sequence the questioning of the prospective jurors?

24  Mr. Burt, what do you say?

25         **MR. BURT:**  Your Honor, the way --

1          **MS. COFFIN:**  Whoops.

2          **MR. BURT:**  The way it's usually done or it's done in

3    a lot of courts officially is for the Court to set up a

4    schedule of how many people you think you can cover in a day,

5    and then schedule throughout the week, say, 10 or 12 or 15

6    people per day.

7          **THE COURT:**  But that's when you're doing it

8    individually.

9          **MR. BURT:**  Well, no.  What I was going to suggest is

10   this; is that you bring in your group.  Of that group, you

11   would do a group instruction, and --

12         **THE COURT:**  So everyone who is after hardship?

13         **MR. BURT:**  In that group, say, of 15 or 12 or

14   whatever.  And then you would take people individually on

15   death-penalty and publicity questions, while the other people

16   wait.  And so maybe you'd schedule six in the morning; six in

17   the afternoon.  You'd set up a schedule; however many you think

18   you could get through.  You bring them in.  And you get them

19   some general instructions about the way the process was going

20   to work.  You'd ask them general questions that would apply to

21   everybody:  the presumption-of-innocence questions, et cetera.

22         **THE COURT:**  If we had, let's say, 200 people, and

23   they got past the hardship, we would be here at six a day for a

24   long time.

25         **MR. BURT:**  I think we'd need to come to some

1  understanding of how many the Court could do, and how long it's

2  going to take with each individual juror.  Generally, the

3  Court -- I haven't seen too many courts getting beyond, maybe,

4  15 people a day.  And part of the problem with having more than

5  that is if you, for some reason, don't get through that many,

6  then you have people spilling over, and the schedule gets

7  interrupted.  So you've got to come up with some realistic

8  number that you can get through in the morning and the

9  afternoons.  And that way, you don't have 200 people sitting

10  around while you're individually questioning.

11        **THE COURT:**  Well, how does this subject relate to

12  your other motion about strike-as-you-go?  What --

13        **MR. SATRIS:**  Well, I think, your Honor, one of the

14  advantages of the strike-as-you-go is you won't be doing as

15  many individual -- *voir dire* as many individual jurors, because

16  you take them one at a time.  And then you make your challenges

17  there -- cause and peremptory.  And then -- and you do that

18  until you fill up the box.

19        And so it's not like -- like you have to qualify

20  scores of jurors, and then you have to, you know, jockey back

21  and forth and strategize about if I -- if I strike this person,

22  then, you know, someone down the line is going to come up.  So

23  I think it's going to be a lot more economical, and it takes

24  the gamesmanship out of it.

25        **THE COURT:**  Well, let's be clear.  Let's say that we

1  bring in -- let's say that we now cleared out everybody who has

2  a hardship.  And we have 200 left.  Just -- I don't think it

3  will be that high, but let's say there are 200 left.  I'm not

4  sure you would be entitled to know the sequence in which they

5  would be brought in.

6       Let me pause on that.  What's the answer to that?

7  Normally you would not.

8       **MR. SATRIS:**  Well, in the strike-as-you-go, it

9  wouldn't matter.  You wouldn't know the sequence, because

10 you're making a determination as to each individual juror.

11      **THE COURT:**  All right.  So you would not have the

12 ability, as the lawyer, to say, "I'm going to strike this

13 person because I know the very next person looks like somebody

14 good for me," or vice versa; not strike?

15      **MR. SATRIS:**  Right, or decide -- or decide to pass on

16 somebody, and then later, when the jury panel's looking a

17 little different, go back and strike that person.

18      **THE COURT:**  Okay.  Let's say we have 200 passed for

19 hardship.  And then we bring in, let's say, 12.  And then your

20 idea is for me to then get a group instruction on everything

21 other than the death penalty, and maybe publicity, and then

22 individually *voir dire* every one on the death penalty?

23      **MR. SATRIS:**  Right.

24      **THE COURT:**  But whenever I get to number one -- let's

25 say I have number one there.  Then there will come a point

where we've run out of questions.  And you have to exercise
your peremptory or your challenge.  Let's say, passed for
cause.  So then I'd say, "Does everyone pass for cause?"  Let's
assume that you say you object.  I then overrule the objection,
hypothetically.  Then either you use a -- you use a peremptory,
or not.

        **MR. SATRIS:**  Right.

        **THE COURT:**  Or the same could be true for the
Government.  The Government may want to get rid of that person.

        **MR. SATRIS:**  And then if we both pass, that person is
seated.

        **THE COURT:**  That person is going to be on the jury.

        **MR. SATRIS:**  That's right.

        **THE COURT:**  One other question.  Does it alternate as
to who goes first?

        In other words, does the Government always have to go
first, or do you have to go first, or how does it all -- who
goes first on the peremptory?

        **MR. SATRIS:**  Well, we would say the Government.

        **THE COURT:**  Is that the law?

        **MR. SATRIS:**  No.  I don't know on that, your Honor.
I thought it was alternate.

        **THE COURT:**  So would it alternate.  Mr. Hall, would
it alternate back and forth?

        **MR. HALL:**  It seems to me that that would be the fair

1   way to do it, your Honor; that there is a certain advantage to

2   going second.

3          **THE COURT:**  Sure, because you both may want to knock

4   somebody off.

5          **MR. HALL:**  Right.

6          **THE COURT:**  And if the other side uses a peremptory,

7   then you get to save one.

8          **MR. TAMBURELLO:**  Let's say we have 200 that pass the

9   hardship.  When are we going to do the questionnaire?

10         **THE COURT:**  Well, the --

11         **MR. HALL:**  Right after.

12         **THE COURT:**  Well, the questionnaire would be up

13  front.

14         **MR. HALL:**  Right.

15         **MR. TAMBURELLO:**  So my understanding is the way the

16  jury commissioner does it --

17         And I think the questionnaire should be filled out in

18  the jury commissioner's room, because they have places to write

19  on, as opposed to coming into court.

20         Once they fill out the questionnaire, then we have an

21  opportunity to review those questionnaires.  And sometimes it

22  might take at least a week for us to understand who the people

23  are.  And then they come in.  And then your Honor is going to

24  instruct them.

25         **THE COURT:**  I promise you we're not going to take a

week.  You don't have the right for that, Mr. Tamburello.
We're going to get started right away.  If we use that system,
maybe the next day we'll be with the first group, going right
at it, trying to -- I can't imagine a circumstance where you
need a week.

**MR. TAMBURELLO:**  Well, let's see.  What happens
normally is when the questionnaire was filled out, you want to
take a look at it, so that we can formulate whatever questions
that we want the Court to ask, or that we're going to ask, if
the Court's going to allow us to do that.

**THE COURT:**  Well, you'll have some time to do that,
but you having a week to do that -- I don't see that, but your
general point about the questionnaire sequence is correct.

**MR. TAMBURELLO:**  All right.

**THE COURT:**  We'll do the hardship.  Then we'll do the
questionnaire.  We have some time, but probably less than you
want, to evaluate it; but then if we do this strike-as-you-go
method, then we would bring in as large as practical a group as
possible on one day, and ask group questions that can be asked
on a group basis.

**MR. TAMBURELLO:**  Right.

**THE COURT:**  Then ask individual questions.  And then
at some point in the day, we will say, "All right.  We've run
out of questions.  Does anyone want to challenge this juror?"

So let's say the Government says no, and you say

1  no -- both sides.  That person will be on the jury for good.

2  Right?

3          **MR. BURT:**  Right.

4          **MS. COFFIN:**  Correct.

5          **THE COURT:**  Now let's say that you say, "No, we don't

6  like that juror."  And maybe we've got a ground for knocking

7  that person out for cause.  So then that person gets struck.

8  You'd have used a peremptory.

9          Then we go to number two, and see see if that will

10 pass.  Let's say that this time, both sides object.  I guess --

11 I don't know.  I guess when both sides object, I would excuse

12 that person, but I'd have to be clear.

13         But let's say that both sides pass.  Then that person

14 would be the the jury.

15         So if somebody is brought in, and they -- in a

16 peremptory, and it be -- cause is denied, or passed for cause,

17 and no one uses a peremptory, then that person would be on the

18 jury.

19         So it does seem to me that this strike-as-you-go

20 would get us a jury faster, wouldn't it?

21         **MR. HALL:**  I don't think so.

22         **THE COURT:**  Mr. Hall?

23         **MR. HALL:**  I don't think so, your Honor.

24         **THE COURT:**  What's your argument against it?

25         **MR. HALL:**  Your Honor, once you get past challenges

1  for cause, I don't see that this -- the selection process is

2  any different -- perhaps a little bit larger, but not any

3  different than the Court's normal.

4       We'll figure out how many challenges there are.  Say

5  30 for the defendant, 26 for the Government; whatever the Court

6  ends up saying; however many alternates; however many there

7  are, plus 12, plus 8.  And that's the number that we have.  And

8  then we can use our peremptory challenges from there.

9       **THE COURT:**  But then I have to go through and qualify

10  a larger number than might be possible as -- under the

11  strike-as-you-go.

12       **MR. HALL:**  Yes.  And I don't think that's an infinite

13  number.

14       **THE COURT:**  It's not infinite, but it's --

15       **MR. HALL:**  We're going to start out with a hundred;

16  two hundred, perhaps, after hardship.  It will go down

17  dramatically, I think, for -- after challenges for cause.

18       And we'll be left with whatever that number is.

19       **THE COURT:**  Let's say that we -- well, all right.

20  Hypothetically, how many challenges does the Government get --

21  peremptory?

22       **MR. FRENTZEN:**  Twenty.

23       **MR. HALL:**  Well, we get 20 under 24(b), we think, for

24  two capital defendants, assuming that it stays that way.  If

25  there was a third, then it would be 20 on each side.

1          We think that if Mr. Milburn is not authorized for

2   the death penalty, it might be something like 30 and 26.

3          **THE COURT:**  Wait a minute.  Let's say that he is

4   authorized, first.

5          **MR. HALL:**  Twenty and twenty.

6          **THE COURT:**  Twenty and twenty?

7          **MR. HALL:**  Yes.

8          **THE COURT:**  Total, on both sides?

9          **MR. HALL:**  Total.

10         **THE COURT:**  So you get 20?  The defense gets 20?

11         **MR. HALL:**  Yes, that's what 24(b) Federal Rule of

12  Criminal Procedure says.

13         **THE COURT:**  What if he is not authorized?

14         **MR. HALL:**  Then I think that he gets an additional

15  ten -- Mr. Milburn.  And the Government gets six.

16         **THE COURT:**  So it would be 30 for the defendants?

17  And you would get an additional six?

18         **MR. HALL:**  Six, right.

19         **THE COURT:**  So, in an odd way, if it's an all-around

20  capital case, there are fewer peremptories?

21         **MR. HALL:**  Yes.

22         **THE COURT:**  Is that the way -- you all understand the

23  way the rule works?

24         **MR. TAMBURELLO:**  No

25         **THE COURT:**  How do you understand it works?

1    **MR. BURT:**  We have a motion to ask the Court to split

2  up the peremptory challenges, so that we have individual

3  challenges.

4        **THE COURT:**  I understand you have a motion, but

5  that's discretionary with the Court.

6        **MR. BURT:**  Right.

7        **THE COURT:**  But the Government is saying that the way

8  the rule works is that, without giving your peremptories, it's

9  20 and 20 if he is authorized, and 30 and 26 if he is not

10  authorized.

11        **MR. BURT:**  That's the way the rule is worded.

12        **MR. TAMBURELLO:**  But, your Honor, the motion that we

13  have before the Court tries to -- to make it clear that that's

14  an incongruous result.  If you have three capital defendants,

15  to give them less preemptory challenges doesn't really make

16  sense, in terms of the concept of what would be a fair trial.

17        And if he's not authorized, then to give more -- that

18  just turns it upside down on its head.  We're proposing that we

19  each receive 20 challenges if we're capital defendants, and the

20  Government receives 20.

21        **THE COURT:**  All right.  Now, I'm not necessarily

22  rejecting that --

23        **MR. TAMBURELLO:**  Right.

24        **THE COURT:**  -- but I want to -- so if we did 20, 20,

25  and 20, that would be 60.  So how many would the Government

1  get, under your proposal?

2        **MR. TAMBURELLO:**  They would get 20.

3        **THE COURT:**  Your side gets 60?  They get 20?

4        **MR. TAMBURELLO:**  Well, the Court can adjust that.

5        What we're saying is that is discretionary with the

6  Court, obviously.

7        **THE COURT:**  Well, let's say, then, that we -- I'm

8  going to call the total number of peremptories for you "*X*," and

9  the total for them "*Y*."  So -- and then we need 12 jurors.  And

10  we're not even talking about the alternates yet.  So that would

11  mean that I would have to -- we could have -- we could have *X*

12  plus *Y* plus 12 is how many that Mr. Hall wants me to qualify

13  before anybody exercises a peremptory.

14        So if -- under your system, that would be -- 80 plus

15  12 is 92.

16        **MR. TAMBURELLO:**  Correct.

17        **MR. HALL:**  And, your Honor, I would point out that

18  the greater the divergence is between what the defendant -- the

19  number of peremptories the defendant gets, and the number of

20  challenges -- the perempts the Government gets, the more unfair

21  the strike-as-you-go system becomes.

22        In other words, if we have 20, we use 20 on the first

23  20 jurors, or 20 out of 30, we use them all up, they still have

24  40.  Say they -- you know, ultimately, there comes a time when

25  all the rest of the jurors are whoever the defense wants,

1 unless there's a cause issue.

2     **THE COURT:**  What does the statute say?  Let's just

3 say hypothetically that the Court granted more peremptories.

4 Can that be done on the condition that you have to exercise

5 that first, before the Government has to exercise its -- or is

6 there anything in the statute that speaks to that?

7     **MR. BURT:**  (Shakes head from side to side)

8     **MR. TAMBURELLO:**  I think the Court can do it that

9 way.  In other words, set it up so that the Government

10 exercises a peremptory first?

11     **THE COURT:**  No, no.  You exercise first, because, in

12 other words, if you get -- take Mr. Hall's point.  Not only do

13 you want 60, but you probably want the Government to exercise

14 its first, in which case maybe they knock somebody off that you

15 would knock off anyway.

16     **MR. TAMBURELLO:**  So, in other words, what would

17 happen -- let's say that we alternate.  In other words, that --

18 let's say the Government starts out first.  Then Diaz is

19 second.  Fort would have to be third, in other words, so that

20 the defendants would go next in order, and leave the Government

21 with their -- still -- 20.  And they would be able to see

22 whether or not we actually exercise our peremptories.  I think

23 the Court can fashion it that way.

24     **THE COURT:**  I have got to think about this.  I see

25 the relation.  I see Mr. Hall's point.  They could very quickly

1  be in a position where they had no peremptories, and you had a

2  whole bunch of them.

3          MR. TAMBURELLO:  I think that applies with the

4  strike-as-you-go system, as opposed to the other system that is

5  also available to the Court.

6          THE COURT:  Mr. Hall, if we did it the way you are

7  proposing -- so let's say --

8          MR. HALL:  The struck jury system is the one the

9  Court normally uses.

10          THE COURT:  The one I would normally use; but we'd

11  never have this many peremptories.  So we'd have 60 plus 20

12  plus 12, if we use the numbers Mr. Tamburello mentioned.  So

13  that would mean we would have to pass for cause or reject cause

14  challenges to 92 people before we could start exercising

15  peremptories.  In other words, we would save the exercise of

16  peremptories under the system I normally use.

17          MR. HALL:  Until we have 92?

18          THE COURT:  Until we pass for cause 92 people.

19          MR. HALL:  I think that's right.

20          THE COURT:  That would take a long time.

21          MR. HALL:  Yes.  I don't disagree with that.  And

22  I --

23          THE COURT:  It might be a lot shorter.

24          MR. HALL:  It might be a lot shorter, but it might be

25  a lot unfairer, we think, specifically to the Government.

1  We're not putting ourselves in the defendants' shoes, but --

2      **THE COURT:**  Help me understand the point of

3  unfairness, so I can see where the rub is.

4      **MR. HALL:**  Well, number one, I think that -- I don't

5  know what the Court's leaning is, but I'm -- I know what the

6  defendants have proposed.  And that is that they get a lot more

7  challenges than we do.  I think that's the first one, is that

8  we will run out before they do.  And when we run out, they get

9  whoever's -- you know, they essentially get carte blanche of

10  whoever's left.

11      **THE COURT:**  Why wouldn't that still be true if we

12  passed 92 people for cause, and we went through the normal -- I

13  mean, the normal thing would be there would be some kind of a

14  schedule where the Government would go first, and then the

15  defense, and then -- so you would have a -- you wouldn't

16  necessarily run out, but you would -- they would still have a

17  lot more --

18      **MR. HALL:**  I think everyone -- in the struck jury

19  system, everyone knows who's there; that, in addition to the

20  pros and cons of Juror Number Four, you have the -- you have to

21  weigh the pros and cons of Juror Number 40, or whatever it

22  would be, as to whether or not you like --

23      In other words, you're looking at the jury as a

24  whole, which we think is important; that we ultimately have a

25  jury that we think will be fair to both sides; each side

looking at it particularly from their point of view, but we're looking at the jury as a whole.  I think the dynamic changes person by person, you know, group by group.

How many women are there, how many men are there, how many blue-collar workers are there, how many whatevers -- are all something that both sides might have in mind as they're going about picking a jury -- some goal.  And that is best served if you're looking at the jury as a whole, which --

We think the struck jury, the system the Court normally employs -- I think that is one of the reasons that is as effective and as useful and as employed as it is.

**THE COURT:**  What does the defense say?  What does the -- what are the main one or two considerations that go -- what do you say to what Mr. Hall just said?

**MR. SATRIS:**  Well, I think that's one of the criticisms of the struck jury system.  The party can shape the jury according to race, according to class; whereas this is a more random, impartial way of picking a jury -- the strike-as-you-go -- by dealing with each juror individually.

And then the second point is -- is the economical nature of it, because you do not need to spend as much time qualifying an enormous jury pool.

So it's those two things, your Honor.

**MR. HALL:**  And maybe I'm not seeing it, but I'm not sure that "We don't have to qualify a bigger pool" is

1  necessarily true.  If they get 60, we get 20, that's still 80

2  picks.  That's still 80 knocks.  And even if we are left with

3  the last 12, last 20, that's 100 jurors.

4      **MR. SATRIS:**  But we might just use 5 out of 60, or

5  Mr. Fort might use 2 out of 20.  And then he's passed on his

6  jury.  And so then you don't go to the other 18 that need to be

7  qualified, because you've picked a jury much sooner than the

8  exhaustion of the peremptories.  That's the idea.

9      **THE COURT:**  All right.  I don't know the answer to

10  this yet.  I have thought about it.  And I think -- okay.

11      On any of the other motions that are pending today,

12  does anyone want to give any further oral argument?

13      **MR. HALL:**  No, your Honor.

14      **THE COURT:**  Can I rule on the papers?

15      **MR. BURT:**  We'd submit it on the papers, your Honor.

16  We did have a motion before the Court to continue the briefing

17  schedule for the last stage of motions.

18      **THE COURT:**  I saw that.  I reluctantly signed that

19  this morning.

20      I keep putting off a lot of work to the end, but I

21  understand the reason, so I went ahead and signed it.

22      **MR. BURT:**  Thank you.

23      **THE COURT:**  Mr. Hall.

24      **MR. HALL:**  The only other question, I guess, is that

25  Mr. Burt's motion we agree with, as far as starting in --

1  starting evidence in January.

2         **THE COURT:**  All right.  I agree with that.  We're

3  going to start on -- starting with me on this.  We're going to

4  start on January 12.  Is that a holiday?  Tell me if that's a

5  holiday.

6         **THE CLERK:**  No.

7         **THE COURT:**  Okay.  January 12th.  Anybody going to

8  argue with me on that?

9         **MR. SATRIS:**  No.

10        **MR. HALL:**  No.

11        **THE COURT:**  So that would be on the evidence.  That

12 would be the opening statements and evidence.

13        Okay.  And then we would just be in continuous

14 session on -- virtually continuous session, starting our trial

15 date, which is November --

16        **MR. HALL:**  Seventeenth.

17        **THE COURT:**  Seventeen, in order to -- okay.  What

18 else?

19        **MR. SATRIS:**  Well, your Honor, just to alert you

20 to -- a potential problem is we've recently encountered some

21 problems of -- well, we haven't yet, actually, but we've been

22 working it out to -- access to the client.  The jail has said

23 because of staff shortages and so forth, they've been very

24 discouraging of contact visits, to the point where they may

25 suspend them.  And so I tried to work that out with opposing

1  counsel, but they basically say, "Hey, we're out of that.  We

2  take no position on that."  So I'm -- we may be coming to the

3  Court, if need be, to resolve the problem.

4          THE COURT:  You mean contact visits where you meet

5  with your client, getting ready for trial?

6          MR. SATRIS:  Right.  We've been having them.

7          THE COURT:  Well --

8          MR. SATRIS:  Now they're talking about suspending

9  them to a non-contact basis, so you're talking over the phone

10 or through the window and so forth.  That's critical for us.

11         THE COURT:  I'm -- look.  Who is my number-one

12 marshal here today?

13         THE MARSHAL:  (Indicating)

14         THE COURT:  We've got to have contact visits for the

15 lawyers.  This is a death-sentence case.

16         THE MARSHAL:  Yes, your Honor.

17         THE COURT:  So tell the jail to let them continue to

18 meet with their clients.

19         MR. SATRIS:  Thank you, your Honor.

20         THE COURT:  All right.  Anything more today?

21         MR. BURT:  No, your Honor.

22         THE COURT:  You know, I feel last time you were here,

23 you told me that -- where does it stand on the DOJ, and whether

24 or not Mr. Milburn is going to be authorized or not?  Why can't

25 they make up their mind?

1          **MR. FRENTZEN:**  Well, Judge, I mean, what's in front

2     of them right now is a proposal to resolve the entire matter.

3     And that's what's -- that's what we're trying to get back from

4     them right now.

5          **MR. HALL:**  We have seen a little bit of progress that

6     way, your Honor.  We've seen it go up one or two steps towards

7     where it should be, without any news back to us that there's a

8     problem.  So --

9          **THE COURT:**  Well, okay, but you know, the --

10          **MR. HALL:**  The overall answer to -- the question is:

11     why is it taking so long?  I don't think we can ask.

12          **THE COURT:**  I hope they know back there that we have

13     a lot of lawyers on the defense side who are burning up C.J.A.

14     dollars at a large rate.  The Government is burning up federal

15     resources at a large rate.  And I'm having to make rulings.

16          And it's going to be quoted back at the Government

17     later on in some other case, or maybe it will help the

18     Government in some other case -- I don't know -- but a lot of

19     judicial resources, I think, are being spilled.  That seems to

20     me if they're going to make up -- it's okay with me whatever

21     they do.  You have the right to a fair trial.  And the

22     defendants have a right to a -- and we're going to have it, but

23     if this is just -- if we're spinning our wheels here, it seems

24     crazy.  So why can't they at least be put on notice that a lot

25     of resources are being consumed while they make up their mind

1  back there?

2      **MR. FRENTZEN:**  Judge, I can tell the Court that

3  they've been put on notice of that, along with a lot of other

4  things.  And just so that the Court's aware, I mean, I have

5  had -- we have had a lot of things -- it's, to a certain

6  extent, an interactive process.  And we have had a lot of

7  things sent back to us to answer questions, and to do things to

8  further assist what's going on there.

9      Just so that the Court knows, it's not -- I am

10  personally aware it's not sitting on a desk somewhere.  It's --

11  there has been movement, in the sense of both it moving from

12  people to people, as well as questions and further things that

13  the Government has had to do to satisfy the people who are

14  eventually going to make the decision.  So they're aware of

15  that.

16      **THE COURT:**  Do they have some notion in their mind

17  that the trial date is going to be put off, or --

18      **MR. FRENTZEN:**  No.

19      **THE COURT:**  -- the day is going to come when we have

20  to ask these jurors, "Do you know any of these witnesses"?

21      **MR. FRENTZEN:**  Understood, Judge.

22      **THE COURT:**  And that's whenever you're going to be

23  upset that the witness' names are going to be used.

24      **MR. FRENTZEN:**  I will be upset, your Honor.

25      **THE COURT:**  And then you say to the people at the

```
1   DOJ, "You put us in this position.  Don't blame the Judge."
2            MR. FRENTZEN:  I say lots of things to them, Judge.
3   And, you know, so that's -- that's -- I understand where the
4   Court's coming from.  And the Court's not alone with those
5   sentiments.
6            MR. HALL:  Your Honor, we have periodically -- in
7   fact, more times lately -- tried to spur on their
8   decision-making process.  And we will use the Court's
9   suggestions to us today to do that again.
10           THE COURT:  I wish you would.  I feel sometimes,
11  2,800 miles away, they don't appreciate the people out here on
12  this end of the country are working hard on this case.  And
13  it's an important decision for all of the people at that table,
14  and for you, and for the public.
15           All right.  I will try to get out more written orders
16  and spill more ink on these issues that are important in this
17  case.
18           When do I see you again next?  Is there a day of the
19  pretrial conference?  Isn't that it, now?
20           MR. HALL:  Yes, I think that's it, unless the Court
21  wanted to -- and I don't think we need to meet as far as after
22  our jury questionnaires have reached --
23           THE COURT:  You're going to send that to me.  And
24  maybe we'll -- maybe I'll call a special meeting now.  Has time
25  all been taken care of?  Excluding time?
```

1          **MR. HALL:**  Yes.

2          **THE COURT:**  All right.  Great.  Okay.  Who was it

3    that's going to see their daughter go to college?

4          **MR. TAMBURELLO:**  I am, your Honor.

5          **THE COURT:**  What college is that?

6          **MR. TAMBURELLO:**  She's going to Whitman College, in

7    Walla Walla, Washington.

8          **THE COURT:**  I worked for Justice Douglas, and we went

9    to Whitman College.

10         **MR. TAMBURELLO:**  That's correct; he did.

11         **THE COURT:**  And just still as famous as it was then.

12   Congratulations to her.  You tell her that that's an excellent

13   school.

14         **MR. TAMBURELLO:**  We're all looking forward to it.

15         **THE COURT:**  Maybe she'll grow up to be a lawyer, like

16   you.

17         (At 10:55 a.m. the proceedings were adjourned.)

18                       -   -   -   -

19

20

21

22

23

24

25

# CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR 05-167-WHA, United States v. Diaz, et al., were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Friday, September 5, 2008